UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-20173-CR-ROSENBAUM/MATTHEWMAN

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

MALINSKY BAZILE,

    Defendant.

_____/

FILED by ___*KZ*___ D.C.
ELECTRONIC

**June 28, 2013**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

THIS CAUSE is before the Court pursuant to an Order of Reference from United States District Judge Robin S. Rosenbaum [DE 29]. Before the Court is Defendant Malinsky Bazile's "Motion to Suppress Physical Evidence" [DE 27]. The United States has filed a response [DE 31], and an evidentiary hearing was held on June 14, 2013. Additionally, on June 19, 2013, the defendant filed a post-hearing supplemental memorandum [DE 34]. The matter is now ripe for disposition. For the reasons that follow, it is respectfully recommended that the motion be **DENIED**.

### I.    Procedural Background

On March 6, 2013, Defendant Malinsky Bazile was charged by way of a Criminal Complaint with use of unauthorized access devices in violation of Title 18, United States Code, Section 1029(a)(2), fraud and related activity in connection

1

with computers in violation of Title 18, United States Code, Section 1030, and aggravated identity theft in violation of Title 18, United States Code, Section 1028A(a)(1).   On March 18, 2013, the United States Attorney filed an Information charging Bazile with those offenses as well as a few more.  On May 28, 2013, Bazile moved to suppress certain written and oral statements he made to investigating agents, arguing that they were obtained before he was given a *Miranda* warning. He also moved to suppress any evidence found as a result of the agents' search of his residence, vehicles, and personal property, asserting that although he signed written forms signifying his consent to search, that consent was not freely given. The Government responds that suppression of Bazile's statements is unwarranted because Bazile was not in custody when he made them.  It also maintains that Bazile's consent to search his residence, cars, and other personal property was freely given and not the result of coercion.

## II.   Evidentiary Hearing

An evidentiary hearing was held before the undersigned on June 14, 2013. The parties declined the opportunity to present opening statements and the Court proceeded to receive evidence.  The United States called two witnesses:  Special Agent Donald Morin of the Federal Bureau of Investigation ("FBI") and Detective Fabio Sanchez of the Miami Police Department.  The Government introduced four exhibits without objection:  an automated teller machine surveillance photograph purporting to show the defendant (Exhibit 1), four FD-26 FBI consent to search forms and a schematic of Bazile's apartment (Exhibit 2), screenshots of the Florida

2

Driver and Vehicle Information Database (Exhibit 3), and the defendant's signed written confession (Exhibit 4).  Bazile, despite being explicitly advised of his right to call witnesses in his own defense and his right to testify at the hearing, declined to do so.  Counsel then made closing arguments, and the matter was submitted.

### III.   <u>Findings of Fact</u>

The following findings of fact are based on the evidence presented at the aforementioned evidentiary hearing and the undersigned Magistrate Judge's assessment of the credibility of the witnesses.

### A.  Prologue

The standard FBI practice for arresting a subject is as follows.  Prior to arrest, an operational plan is prepared by the lead agent.  That plan is forwarded on to a supervisor for approval.  After an immediate supervisor signs off, it then goes to upper management for further review.  After the operational plan receives final approval, an arrest team consisting of several agents effectuates the arrest at an early morning hour.  Members of the arrest team are typically attired with ballistics vests bearing a visible "FBI" marker, and are armed with tactical gear which may include flashlights or oleoresin capsicum (OC) spray.

In Spring 2012, Special Agent Donald Morin of the FBI ("Agent Morin") became involved in an investigation relating to allegations of corruption at the North Station of  the Miami Police Department.  At the time, Defendant Bazile was employed as a police officer at the North Station.  As an officer with the Miami

Police Department, Bazile received training on *Miranda* warnings as part of his initial training.

Bazile came to the attention of federal agents involved in another investigation, and since Agent Morin was already involved in investigating the North Station, he was brought in to continue the investigation of Bazile. In 2011, the Fort Lauderdale (Florida) Police Department arrested Bazile's stepbrother, Jean Charles. In Charles's possession were 10 prepaid debit cards. Those debit cards had a value of approximately $31,000. It was later determined that the debit cards were obtained from the filing of fraudulent and/or fictitious federal income tax returns.

After Charles's arrest, investigators conducted an audit of Defendant's police car computer and specifically the queries he made in the Florida Driver and Vehicle Information Database ("DAVID"). DAVID is operated by the state of Florida and contains personal information for persons who possess a Florida driver license. A person's DAVID record includes his or her social security number and date of birth. During their investigation, agents found that Defendant Bazile had queried nearly 1,000 individuals using his department-issued Miami Police Department vehicle computer. Agents then installed special software on the computer that allowed them to monitor his computer activity. Specifically, the software surreptitiously logged Bazile's keystrokes and took screenshots at specified intervals.

According to Agent Morin, the information gleaned from this software showed Bazile conducting highly questionable and unusual searches for individuals' driver license information.  For example, Bazile ran a search for females between the ages of 57 and 61 with a common last name such as "Rogers," and a first initial of "A." Agents could not determine any legitimate law enforcement activity connected to those searches.  Working with the Internal Revenue Service, investigators determined that there was a correlation between the names that Bazile queried and those persons who had been victims of fraudulent tax returns.  The false tax returns were typically filed a short time after Bazile ran his queries.   Additionally, the wage and refund amounts were almost always the same, and the refund amounts were always sent to a prepaid debit card.  Transaction records for those prepaid debit cards revealed that a number of withdrawals were made from ATMs in Miami, Florida.  Many of the surveillance photos from those ATMs revealed a heavyset black male who made an effort to conceal his identity by covering his face with his hand and wearing a baseball cap.  Armed with this information, Agent Morin decided to approach Defendant Bazile.

## B. The Agents' Discussion With Defendant at Defendant's Home

On October 1, 2012, at approximately 8:30 a.m., Agent Morin and his partner, Task Force Officer Osvaldo Ramos ("TFO Ramos"),[1] went to Bazile's residence in North Miami.  Agent Morin, dressed in business attire with his weapon concealed underneath his jacket, knocked on the door.  Bazile answered, and Agent

---

[1] TFO Ramos is also a Detective with the Miami Beach Police Department.

Morin identified himself as a Special Agent with the FBI and displayed his credentials.  He told Bazile that he and TFO Ramos were conducting an investigation and requested Bazile's assistance with that investigation.  Bazile then invited Agent Morin and TFO Ramos (collectively, "the agents") inside his apartment to speak with them.  Agent Morin did not intend to arrest Bazile on October 1, 2012.  In fact, he did not even believe he had probable cause to effectuate Bazile's arrest.  Agent Morin did not prepare an operational plan or seek approval from his supervisors to arrest Bazile before speaking to him on that date.

As the agents entered Bazile's apartment, he went to the bathroom to change his clothes.  The agents did not follow him in.  When Bazile returned, they did not place him in handcuffs, nor did they direct or restrain his movement.  The agents did not search him for weapons or ask him if he had a weapon, despite knowing that he was a police officer.  Agent Morin, TFO Ramos, and Defendant Bazile then had a seat on Bazile's bed because there was no other place to sit.  Agent Morin explained to Bazile that the agents were conducting an investigation into tax refund fraud, explained the steps they had taken as part of their investigation, and that they knew he was involved in the scams.  At this point, Agent Morin was making a presentation to Defendant Bazile and was not asking many questions.  Agent Morin showed Bazile a photograph from an ATM surveillance camera, *see* Gov't Ex. 1, and Bazile identified himself as being the person in that photograph.  Specifically, Bazile spontaneously uttered "That's me."  Next, Agent Morin explained to Bazile that the agents were several months away from completing their investigation, and

that he had an opportunity to cooperate to lessen his criminal exposure.  He explained the federal system to Bazile, and told him that the extent of an individual's cooperation is generally taken into account by the Court at sentencing. Bazile agreed that it would be in his best interest to cooperate with law enforcement, and agreed to cooperate with the agents. This discussion lasted for about 45 minutes.  At the conclusion of the interview, Bazile asked to be excused to use the restroom.  Bazile was allowed to use the restroom, unescorted, with the door closed.

### C.  The Consents to Search

The agents then secured Bazile's consent to search his home and vehicles.  As part of this process, Bazile executed four FD-26 "consent to search" forms.  *See* Gov't Ex. 2.  These forms covered Bazile's residence, the safe therein, his police vehicle and police computer, his Apple iPhone, his personal vehicle, and three prepaid Kyocera cellular phones.  The forms were countersigned by Agent Morin and TFO Ramos.  Each of the forms describes the places and things to be searched, along with the following statements:

> 2. I have been advised of my right to refuse consent.
> 3. I give this permission voluntarily.
> 4. I authorize these agents to take any items which they determine may be related to their investigation.

*Id.*  Once Bazile agreed to the searches, task force officers who had been waiting outside a short distance away entered the apartment in order to assist in the search.  Law enforcement agents, in casual dress, then began to search Bazile's

property, beginning with his apartment.  At some point they came across a safe in the closet.  The agents asked Bazile if they could have access to the safe, whereupon he provided them with a key and altered his original written consent to search the residence to specifically include the safe.  Inside the safe, agents found a number of ledgers.  Those ledgers contained handwritten entries containing the first names, middle initials, and last names of a number of individuals, along with the corresponding social security numbers and dates of birth.  Agents then moved to search Bazile's police vehicle and personal vehicle.

### D. The October 1 Interview at the FBI Office and the Confession

After the search of his residence had been completed, and while officers were searching his personal vehicle and his department-issued police car, the agents asked Bazile to accompany them to the FBI office in Miami so that they could further explain the details of his cooperation.  According to Agent Morin, there were two reasons for this request.  First, there was no place to sit in Bazile's apartment (the three men had been sitting on Bazile's bed).  Second, the agents figured that the longer they were at his apartment, the more likely it would be that someone would see them there, which might have hindered Bazile's ability to be an effective cooperator.  Bazile agreed to accompany the agents to the Miami FBI office.  At that point, Agent Morin, TFO Ramos, and Bazile got into TFO Ramos's vehicle and headed to the FBI office.  Bazile was not searched prior to entering the vehicle. TFO Ramos drove, and Agent Morin and Bazile sat in the backseat.  In the vehicle, Bazile was not handcuffed or otherwise restrained.  On the way to the FBI office,

the trio stopped to purchase cigarettes for Bazile.  Bazile then smoked in the vehicle on the way to the office.  It was Agent Morin's testimony that he never allowed arrested subjects to smoke while being transported to the FBI office.

At approximately 10:30 a.m., Agent Morin and TFO Ramos began interviewing Bazile in an interview room at the FBI office.  When interviewing an arrested subject, if an agent is not present, the FBI's standard practice is to have the arrestee handcuffed to a bar in an interview room with the door locked.  Bazile was never handcuffed; nor was the door to the interview room ever locked.  During the course of the interview, Bazile was allowed to take a number of breaks, whereby agents walked him outside to the back lot of the FBI building to allow him to smoke.  Since the Miami FBI office is a secure facility, Bazile was escorted outside to smoke and necessarily required an agent to accompany him so that he could re-enter the building. The tenor of the interview at the FBI office was relaxed and non-confrontational.  Bazile admitted that he conducted a number of searches on his police computer in order to obtain social security numbers and dates of birth for various individuals.  Using that information, he filed false tax returns and caused the IRS to issue refunds to a number of prepaid debit cards.  He told the agents that he then withdrew money from these cards using an ATM.  Bazile advised the agents that he made approximately $130,000 to $140,000 from this scheme.  He was again shown Government's Exhibit 1, an ATM photo, and initialed it to admit that the person in the photograph was him.  At no point during the discussion did Bazile ask to stop the interview or ask to call anyone.

After the discussion, Agent Morin stepped out of the interview room, and prepared a statement to summarize the interview.  He came back into the interview room and reviewed the statement with Defendant Bazile.  Bazile agreed that the statement was true and correct, and then added his own paragraph to the end, acknowledging that he knew his actions were wrong, that he took full responsibility for his actions, that he was apologetic, and that he intended to cooperate with the FBI.  Bazile, TFO Ramos, and Morin then signed and dated the bottom of the second page of the statement.  *See* Gov't Ex. 4.

Next, Agent Morin and TFO Ramos continued to discuss with Bazile the scope of his anticipated cooperation.  The agents explained that they would request to continue Bazile on active duty as a Miami police officer, and they went into detail about what he would be doing as part of his cooperation with the investigation.  Two task force officers then returned Bazile to his apartment.  At no point during the discussion was Bazile read his *Miranda* rights.  After the interview, Defendant Bazile continued his work as an active duty Miami police officer.  He retained his patrol car and duty weapon.  Bazile did end up cooperating with law enforcement. He assisted law enforcement in conducting an investigation into two other public officials—a correctional officer and another Miami police officer.  Bazile's cooperation, which lasted from approximately October 2012 to January 2013, involved conducting consensual telephone recordings and wearing a body wire.

### E.  The October 3 Interview at the FBI Office

On October 3, 2012, Bazile was contacted by Sergeant Luquis of the Miami Police Department, who was part of the federal task force investigating the tax refund fraud.  Sergeant Luquis met Bazile at a Publix grocery store, at which point Bazile, who was dressed in jeans and a t-shirt, got into Sergeant Luquis's rental vehicle and the two drove to the FBI office in Miami.

At the FBI office, law enforcement officers, including Sergeant Luquis and Detective Fabio Sanchez of the Miami Police Department, interviewed Bazile again. He was cooperative and again explained to officers how the tax refund scheme worked.  In fact, Bazile demonstrated the process using one of the identities on the ledger agents found in his residence.  Again, Bazile was never restrained during the interview, nor did any officers from his own department or any other order him to give any statement or to cooperate with the investigation.  He was returned to the Publix, where he was free to go home.  At no point before, during, or after the October 3 interview was Bazile read his *Miranda* rights.  He went to work the next day and remained on active duty until March of 2013.  In March 2013, Bazile was called to the Miami Police Department's Internal Affairs Department.  In an effort to induce him to come to the Internal Affairs Department voluntarily, Bazile was told that his assistance was needed with regards to a subpoena.  When Bazile arrived, however, a task force officer was waiting and he was arrested.

# IV.   <u>Discussion</u>

## A. Bazile's Statements to Law Enforcement

In *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme
Court held that a person in law enforcement custody must, prior to interrogation, be
informed that he has the right to remain silent, that anything he says may be used
against him, and that he has the right to consult with an attorney and have one
present during questioning.  *Id.* at 445.  To give an individual this now-familiar set
of admonitions has become known in both the legal lexicon and American popular
culture as "Mirandize"-ing someone.   Despite popular misconceptions, the police (or
in this case, federal agents), don't always have to give an interviewee a *Miranda*
warning.  Rather, *Miranda* is required only when a person is (1) in custody and (2)
under interrogation.  *See Garcia v. Singletary*, 13 F.3d 1487, 1489 (11th Cir. 1994).
Here, it is undisputed that Bazile was not Mirandized before his October 1 or
October 3 statements.  Moreover, the Government does not claim that Bazile was
not under interrogation at the time he made the statements at issue.  Accordingly,
the only issue in dispute is whether Bazile was "in custody" when he made those
statements.

"A defendant is in custody for the purposes of *Miranda* when there has been a
"formal arrest or restraint on freedom of movement of the degree associated with a
formal arrest." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)
(quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  Here, it is undisputed
that Bazile had not been formally arrested at the time he made the subject

12

statements, and so the inquiry is limited to whether there was "restraint on freedom of movement of the degree associated with a formal arrest." *Id.* The touchstone of this analysis is whether "under the totality of the circumstances, a reasonable man in [Bazile's] position would feel a restraint on his freedom of movement to the extent that he would not feel free to leave." *Brown*, 441 F.3d at 1347 (quoting *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)) (internal citations omitted). This is an objective, and not a subjective standard, defined from the perspective of a reasonable innocent person. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir.1996).

### 1. Statements at Bazile's Home

Bazile claims that he was in custody at the time of his initial admissions to Special Agent Morin and TFO Ramos because the officers were seated on his bed, in very close proximity. Under these circumstances, Bazile argues, a reasonable person would not have felt free to leave. In light of the other evidence, however, this argument must fail. The agents, dressed in casual clothes, approached Bazile in a non-confrontational manner. They never brandished their own weapons. They never asked to so much as see his duty weapon, let alone seize it. They were not there to arrest Bazile and had no operational plan in place to make an arrest. At the beginning of the interview, Bazile left the bedroom to change clothes in a bathroom with the door closed. At the end of the interview, he left the agents to use the bathroom, alone and with the door closed. Finally, perhaps most importantly, the interview occurred at Bazile's home, his castle, the place where he presumably

13

would have felt most comfortable.  In other words, the interview took place "on his own turf." *United States v. Korex*, 737 F.2d 753, 756 (8th Cir. 1984).  "Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Brown*, 441 F.3d at 1348 (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir.1994)) (internal quotation marks and changes omitted).  Under these circumstances, the Court has no trouble concluding that a reasonable person in Bazile's position would have felt free to leave.  He was not in custody when he made statements to the officers at his home.

### 2.  Statements at FBI Office

Defendant next argues that his statements at the FBI office in Miami also took place while he was in custody because he was driven to and from the FBI office by a law enforcement officer.  The first trip, on October 1, 2012, happened immediately after his initial contact with federal agents.  Agent Morin testified that he asked Bazile to come with him to the FBI office, and Bazile agreed.  Bazile's vehicle was in the process of being searched by other agents.  Accordingly, Agent Morin suggested that Bazile ride to the FBI office with him and his partner.  During the course of the ride, Agent Morin sat in the rear of the vehicle next to Bazile while TFO Ramos drove.  Agent Morin testified that the purpose of this seating arrangement was so he could more easily continue his questioning of Bazile during the course of the ride.  At the office, Bazile was never placed in handcuffs; nor was

14

he ever confined to a particular room.  Bazile never asked to go home; nor did he ever ask to make a phone call.  Rather, he was allowed to leave the building a number of times to take smoke breaks.  In fact, on the way to the office, the agents stopped so Bazile could obtain cigarettes, which he began to smoke in the car.

The circumstances of the second meeting do not prove any better for Bazile's cause.  On October 3, 2012, Sergeant Luquis of the Miami Police Department, a federal task force officer, called Bazile and informed him that agents wanted to speak with him again at the FBI offices.   He met Sergeant Luquis at a local Publix grocery store and parked his personal vehicle there.  At that point, he entered Sergeant Luqis's vehicle and was driven to the FBI office.  The vehicle in which Bazile rode was an unmarked rental vehicle with no cage. During the course of this interview, he was advised again that he was making a voluntary statement.  Bazile, a police officer with *Miranda* training, even went so far as to demonstrate his scheme to the task force officers using one of the names from the ledger they had discovered in his safe.  Again, Bazile was not handcuffed or otherwise restrained during the course of this interview.  He was permitted to leave the building to smoke (albeit always being accompanied by an agency escort).  Bazile was never ordered or compelled to give a statement. After the interview, he was permitted to go home, and in fact went to work the next day.  A reasonable person in Bazile's circumstances would have felt free to leave the October 3 interview.  To summarize, neither the October 1 nor the October 3 interview was custodial for *Miranda* purposes.

Indeed, the circumstances here substantially mirror those in *United States v. Muegge*, 225 F.3d 1267 (11th Cir. 2000) (per curiam). In *Muegge*, the defendant, a civilian employee employed at an Air Force base, was ordered by his supervisor to report for an interview[2] by the Air Force's Office of Special Investigations ("OSI") at the OSI detachment building, a secure facility that was locked at all times. Over the course of an hours-long interview, and without being advised of his *Miranda* rights, the defendant made a number of incriminating statements that the Government sought to introduce at trial. The district court suppressed the statements because the defendant had not been given his *Miranda* rights. The Eleventh Circuit reversed, holding that the interview was non-custodial for *Miranda* purposes. *Id.* at 1271. Among the factors the court considered were the fact that the defendant was never locked in a room, was allowed escorted smoke breaks, left of his own accord at the conclusion of the interview, and was not arrested until months later. *Id.*

Finally, having found that *Miranda* warnings were not required, the Court specifically finds that Bazile's statements, as described above, were voluntary. *See United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) ("Even if Lall was not in custody in the technical sense (and thus Miranda warnings were not required), we would still be required to address the voluntariness of his confession"). Bazile's conversations with law enforcement were relaxed and cooperative. Although Agent Morin explained the federal system to him and told him that a sentencing judge

---

[2] In the instant matter, of course, Bazile was never ordered to report for an interview or otherwise cooperate with law enforcement. *See* Section IV.C, *supra*.

16

might take his cooperation into account, Bazile was never promised anything in exchange for his statements.   There is no evidence before the Court that he was coerced into making those statements.   In sum, Bazile's statements to law enforcement were made of his own free will.

## B.  The Searches

The Fourth Amendment protects the right of individuals to be free from "unreasonable searches and seizures."  U.S. Const. amend. IV.  Where government agents obtain evidence in violation of a person's Fourth Amendment rights, that evidence may not ordinarily be used against that person in a criminal prosecution. *Wong Sun v. United States*, 371 U.S. 471, 484 –85 (1963).  Warrantless searches and seizures are presumptively unreasonable, unless the government can show that they fit into one of a few narrowly-delineated exceptions.  *Katz v. United States*, 389 U.S. 347, 356–57 (1967).

At the initial interview on October 1, 2012, Bazile signed four separate "consent to search" forms.  *See* Gov't Ex. 2.   He now argues that those forms are invalid because he was coerced into signing them.  "[A] search conducted pursuant to a valid consent is constitutionally permissible."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  But where "a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given . . . . and not the result of duress or coercion,

17

express or implied." *Id.* at 222, 248 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (internal quotation marks omitted)).

Bazile does not contend that any of the forms contain an inauthentic signature.  Rather, he argues that he was coerced into signing them.  In determining whether consent to a search is voluntary, courts in this Circuit look to a number of factors, including

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*United States v. Chemaly*, 741 F.2d 1346, 1352 (11th Cir. 1984), *rehearing en banc granted*, 741 F.2d 1363, *order granting reh'g en banc vacated and panel opinion reinstated*, 764 F.2d 747 (1985) (quoting *United States v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir. Unit B 1981)) (quotation marks omitted).  None of these factors, standing alone, is dispositive of the issue.  *Id.*

> In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances . . . .  In evaluating the totality of the circumstances underlying consent, the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found.

*United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004) (quoting *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).

In *United States v. Duncan*, 356 F.App'x 250 (11th Cir. 2009) (per curiam) (unpublished), police officers knocked on the defendant's door, told him that they had received complaints that he had been selling drugs, and asked him if they could search his home. *Id.* at 252. The defendant agreed; an officer then gave him a consent to search form and explained it to him. The defendant signed the form and allowed the officers to search the residence, whereupon they found incriminating evidence. At no time did the officers threaten the defendant and he never asked them to leave. On those facts, the Court of Appeals found that his consent was voluntary. *See id.*

Here, Agent Morin and TFO Ramos spent 45 minutes discussing their investigation with Bazile. When shown an ATM photograph of one of the suspected fraudsters, he spontaneously uttered, "That's me." Bazile agreed that cooperation would be in his best interest, and he agreed to cooperate. It was only then that he was asked if law enforcement officers could search his residence and vehicles. He gave oral consent, and then signed *four* separate consent forms. In signing each consent form, Bazile acknowledged that (1) he had been asked by FBI agents to permit a complete search of certain items or premises; (2) that he had been advised of his right to refuse consent; (3) that he was giving permission voluntarily; and (4) that the agents were authorized to take any items which they determined would be pertinent to their investigation.

Moreover, at the time he signed the forms, Bazile was a Miami police officer who had been trained on police procedure. The Court of Appeals has treated this

factor as relevant in determining whether consent was freely given. *United States v. Fernandez*, 58 F.3d 593, 597 (11th Cir. 1995) (per curiam) ("Moreover . . . Granger had been a police officer and, therefore, was well aware of police procedures and of his rights"). In light of the foregoing, the Court finds that the Government has met its burden of demonstrating that the searches of Bazile's home, safe, personal vehicle, police-issued vehicle and other personal property were conducted pursuant to his voluntary, non-coerced consent.

## C. *Garrity* Issue

At the conclusion of the June 14 evidentiary hearing, at the defendant's request, the Court granted the parties leave to submit supplemental briefs as to the discrete issue of whether law enforcement officers who are granted entry to a suspect's home after telling him that they are there to conduct an investigation must first specifically inform the suspect that he is the target of their investigation. On June 19, 2013, Bazile submitted a supplemental memorandum. The supplemental memorandum, while unable to point to any authority relating to the Court's specific inquiry, raised, for the very first time, a *Garrity* argument. However, at the suppression hearing, Bazile did not testify, presented no witnesses or evidence, and failed to elicit any testimony regarding any alleged *Garrity* violation.

In *Garrity v. New Jersey*, 385 U.S. 493 (1967), the Supreme Court held that where a statement is obtained from a police officer "under threat of removal from

office," that statement cannot be used in subsequent criminal proceedings. *Id.* at 499. Bazile's *Garrity* claim is untimely. *See generally Abrams v. Ciba Specialty Chem. Corp.*, 663 F.Supp.2d 1220, 1232 n.16 (S.D. Ala. 2009) (declining to consider argument first raised in reply brief); *Martinez v. Weyerhaeuser Mortg. Co.*, 959 F.Supp. 1511, 1515 (S.D. Fla. 1996) (striking portions of reply brief that raised new arguments).

However, even if it were properly raised, the Court has no trouble concluding that the argument would fail on the merits. There is no evidence before this Court that the agents ever explicitly threatened Bazile's job or employment status in obtaining the statements from him. He was told his statements were voluntary; he was not coerced or compelled to give any statement. Moreover, there is nothing in the record to show that Bazile subjectively believed that he was going to suffer an adverse employment action if he failed to give a statement. Finally, even if Bazile actually held that belief, it would not have been an objectively reasonable one. *See United States v. Camacho*, 739 F.Supp.1504, 1514–15 (S.D. Fla. 1990) (Marcus, J.) (where employee is not directly threatened with termination, *Garrity* protection only applies where he has both a subjective and an objectively reasonable belief that he may lose his job if he fails to give the statements). Indeed, Bazile remained as an active duty police officer for several months after his statements. In sum, Bazile's *Garrity* claim is both untimely and without merit.

## IV. Conclusion

For the foregoing reasons, it is respectfully recommended that Defendant's Motion to Suppress [DE 27] be **DENIED** in its entirety.  The parties are hereby advised that any objections to this Report and Recommendation must be filed in writing with the presiding District Judge within 14 days.  *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2).

**DONE and SUBMITTED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this **28th** day of June, 2013.

WILLIAM MATTHEWMAN
United States Magistrate Judge